# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
April 2, 2002 Session

# STATE OF TENNESSEE v. CHRISTOPHER M. FLAKE

### Appeal by permission from the Court of Criminal Appeals
### Criminal Court for Shelby County
### No. 97-09256    Bernie Weinman, Judge

### No. W2000-01131-SC-R11-CD Filed - August 29, 2002

E. RILEY ANDERSON, J., with whom ADOLPHO A. BIRCH, JR., J., joins, concurring in part and dissenting in part.

I concur in the majority's holding that a jury verdict rejecting the insanity defense should be reversed only if the appellate court, viewing the evidence in a light most favorable to the prosecution, concludes that no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence.

I disagree, however, with the majority's application of the standard to the facts and circumstances of this case in which virtually all of the lay and expert testimony established the defendant's insanity *at the time of the offense*. Tenn. Code Ann. § 39-11-501(a) (1997). In my view, the Court of Criminal Appeals correctly determined that no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence. I therefore dissent.

As the majority recognizes, the evidence indicated that the only two witnesses to the offense – Turner Carpenter, the pastoral counselor, and Patricia Ann Hoffman – described the shooting as bizarre and unexplained. According to Carpenter and Hoffman, they were in Carpenter's office in a counseling session when the defendant "stuck his head in" and asked to meet with Carpenter. When Carpenter said he would meet with the defendant in fifteen minutes, the defendant left briefly and then suddenly returned wielding a pistol and yelling Carpenter's name. After shooting Carpenter, the defendant held the pistol to Hoffman's head for a few moments and then fled from the scene. Carpenter testified that the defendant was yelling in an "abnormal" voice and had changed from a normal appearance to "horrible looking," "crazed," and "the devil himself." Carpenter

described the shooting as "totally off the wall, weird, and crazy," and said that there had been no ill will between he and the defendant.[1]

The evidence also established that the defendant had a ten-year history of mental illness, including depression, mixed chemical dependency, oppositional disorder, and major affective disorder, for which he had been hospitalized. The evidence showed that his mental state had substantially deteriorated during the week immediately preceding this shooting. In fact, the defendant's bizarre behavior was so apparent that his worried father scheduled an additional appointment with the defendant's treating psychiatrist, Dr. Janet Johnson, on April 3, 1997, only two days after his previous session. Dr. Johnson's notes from the April 3, 1997 visit, which was only three days before the shooting, described a recent incident where the defendant saw a man working on his farm and left his Prozac medication in the man's mailbox because he "looked like he needed help."

Finally, the trial evidence revealed that a total of *five* mental health professionals, both psychiatrists and psychologists, performed numerous, comprehensive evaluations of the defendant and all determined that he suffered from a severe mental illness, schizophrenia, and was unable to appreciate the wrongfulness of his conduct in shooting the victim. Indeed, after the offense and prior to trial, the defendant was examined by a number of psychiatrists and, as a result of the proof, the trial court found him to be incompetent to stand trial for a period of over two years after the offense. The trial court declared him competent to stand trial only after the State had furnished extensive treatment and anti-psychotic medication over the more than two years following the offense.

The first mental health professional to evaluate the defendant was Dr. Lynne Zager, a clinical psychologist and Director of the Forensic Services Program at Midtown Mental Health Center. She examined him over a four-month period from October 1997 to January 1998 to determine his competency to stand trial and his mental state at the time of the offense. Dr. Zager testified that the defendant suffered from the severe mental illness of paranoid schizophrenia and that due to the mental illness, he could not appreciate the wrongfulness of his conduct during the shooting on April 6, 1997. Dr. Zager relied in part on the notes of the defendant's treating psychiatrist, Dr. Janet Johnson, regarding the defendant's bizarre behavior.[2]

Next to testify was Dr. Hilary Linder, a practicing psychiatrist for 33 years employed by the State at Western Mental Health Institute. He evaluated the defendant in November of 1998. Dr. Linder, like Dr. Zager, determined that the defendant had suffered from paranoid schizophrenia since his early teen years and could not appreciate the wrongfulness of his acts due to his severe mental illness.

---

[1] After the offense, the defendant showed no emotion when he was arrested and looked "distraught" or "tired" when questioned about the whereabouts of the gun. The defendant told officers that the gun was in a vehicle glove box and he executed a consent to search form.

[2] Dr. Johnson was deceased at the time of trial.

Also testifying for the defense was Dr. Rokeya Farooque, a psychiatrist at Middle Tennessee Mental Health Institute, who evaluated the defendant from November 17, 1997, to December 16, 1997. Dr. Farooque reviewed the defendant's medical records which indicated the defendant had experienced prior hallucinations associated with drug abuse, blackouts, major depression, an anxiety disorder, and an obsessive-compulsive disorder. Dr. Farooque noted that the defendant had received psychiatric treatment, including hospitalization, for his prior conditions. Dr. Farooque testified that the defendant suffered from paranoid schizophrenia and was incapable of appreciating the wrongfulness of his conduct in committing the offense.

The last State-employed mental health professional testifying for the defense was Dr. Sam Craddock, a clinical psychologist at Middle Tennessee Mental Health Institute, who stated that he evaluated the defendant from November 17, 1997 to December 16, 1997. He agreed that the defendant had paranoid schizophrenia, which is a serious mental illness, and that the defendant could not appreciate the wrongfulness of his actions in committing the offense. Dr. Craddock added that the defendant "morally felt justified" to shoot the victim because he apparently believed the victim was a terrorist.

The final mental health professional to testify for the defense was Dr. John Hutson, a clinical psychologist employed by the defense, who stated that he had evaluated the defendant, reviewed his lengthy history of mental illness and treatment, and administered several tests, including the MMPI-II, which revealed he was psychotic. According to Dr. Hutson, the defendant believed he was working for the government as an agent or enforcer when he shot the victim. Dr. Hutson determined that the defendant suffered from schizophrenia, undifferentiated-disorganized type, which he called a serious, incapacitating mental illness. He testified that the defendant was one of the three "most disturbed individuals" he had ever seen among the over 10,000 persons he had evaluated in his career, and one of only 25 patients whom Dr. Hutson concluded could not appreciate the wrongfulness of his or her conduct.

Finally, Rebecca Smith, a psychiatric social worker at Western Mental Health Institute, testified that she interviewed and obtained a history from the defendant. According to Smith, the defendant believed that Carpenter, the pastoral counselor, was a terrorist with access to chemical weapons, and that voices told the defendant to shoot the victim as a signal to the F.B.I. to come to the church to take care of the terrorists and mafia associated with the church.

To summarize, *all* of the mental health professionals who completed numerous and comprehensive evaluations of the defendant consistently determined that he suffered from a severe mental illness, paranoid schizophrenia, and that he was unable to appreciate the wrongfulness of his conduct in shooting the victim. All of these professionals had years of experience in conducting competency and mental state evaluations. Three of these experts were employed by the State of Tennessee and had no motive to provide testimony favorable to the defense; indeed, three of these same expert witnesses had testified on behalf of the State with regard to whether the defendant was competent to stand trial in this proceeding. In contrast, the State presented no expert testimony

showing that the defendant did not have a mental illness or that he could appreciate the wrongfulness of his conduct.

Although the majority has accurately summarized the evidence from the record, it nonetheless upholds the jury verdict on the basis that the jury is to weigh all of the facts and circumstances and that the jury is not required to accept expert testimony. I agree that the jury has those responsibilities, yet I disagree with the majority's conclusions in this case for several reasons.

First, the majority argues that the defendant fabricated an answer on a gun application made before the offense and acted "normally" on the day of the offense prior to the shooting. These normal actions, however, are as characteristic of schizophrenia as abnormal actions. Second, the majority speculates that the jury may have believed that the defendant's motive for shooting the victim was not because he thought the victim was a terrorist but was in someway related to the defendant's fantasy that the victim was a homosexual. The evidence noted by the majority did not directly relate to the defendant's mental state at the time of the offense, in contrast to the testimony of the two eye-witnesses to the offense and the testimony of five mental health experts regarding the defendant's mental state at the time of the offense. Moreover, the inferences relied upon by the majority did not refute the evidence of the defendant's serious mental illness and his incapacity to appreciate the wrongfulness of his actions at the time of the offense. In fact, the expert witnesses testified without contradiction that persons suffering from schizophrenia do not act bizarre or appear "crazy" all the time and often behave normally for periods of time.

Finally, the majority argues that the State's cross-examination of the defense experts attempted to establish that the defendant was malingering and had never complained of auditory hallucinations until after this offense was committed. All of the mental health experts uniformly and without contradiction responded, however, that the defendant was not malingering or feigning the symptoms of his mental illness. Moreover, two of the State's own rebuttal witnesses – Dr. John McIntosh and Dr. Mark Luttrell – refuted the malingering theory by agreeing that the defendant suffered from a serious mental disease. Significantly, the State's rebuttal witnesses were not asked by the State the core question relevant to the defense of insanity, *i.e.*, whether the defendant could appreciate the nature or wrongfulness of his conduct in shooting the victim.

This is not a case in which experts offered different opinions regarding the defendant's mental state. All were unanimous and testified without contradiction that the defendant suffered from a severe mental illness, schizophrenia, and that he could not appreciate the wrongfulness of his conduct. Nor is this a case in which there was lay testimony regarding the facts and circumstances of the offense that differed from the expert testimony. In short, I can find no basis in this record for the jury to have reasonably rejected the expert or lay evidence regarding the defendant's mental state at the time of the offense. Although I am fully aware that reversal of a jury's verdict under the standard we have adopted will be rare, I am concerned that by upholding the jury's verdict under the facts and circumstances of this case, the majority has made appellate review of a jury's verdict meaningless and useless.

-4-

Accordingly, I concur in the majority's holding that a jury verdict rejecting the insanity defense should be reversed only if the appellate court, viewing the evidence in a light most favorable to the prosecution, concludes that no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence. I disagree, however, with the majority's application of the standard to the facts and circumstances of this case. In my view, the Court of Criminal Appeals correctly determined that no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence. I therefore dissent.

I am authorized to state that Justice Birch joins in this concurring and dissenting opinion.

_____
E. RILEY ANDERSON, JUSTICE